**UNITED STATES of America,
Plaintiff,**

v.

**NEW YORK CITY BOARD OF EDUCATION; City of New York, William J. Diamond, Commissioner, New York City Department of Citywide Administrative Services (in his official capacity); and New York City Department of Citywide Administrative Services, Defendants.**

**No. 96–CV–374 RML.**

United States District Court, E.D. New York.

Feb. 9, 2000.

Bill Lann Lee, Acting Assistant Attorney General, United States Department of Justice, Washington, D.C., by Katherine A. Baldwin, Aaron D. Schuham, Marybeth Martin, Tana Lin, Luis A. Lavin, Meredith Burrell, for Plaintiff.

Michael D. Hess, Corporation Counsel of the City of New York, New York, NY, orma A. Cote, Drake A. Colley, for Defendants.

McCarter & Higgins, Shrewsbury, N.J., by George W.C. McCarter, for Proposed Intervenors.

Center for Individual Rights, Washington, D.C., by Michael E. Rosman, for Proposed Intervenors.

### MEMORANDUM AND ORDER
#### (Amended)

LEVY, United States Magistrate Judge.

Presently before the court is the joint motion of the United States (the "plaintiff") and the New York City Board of Education, the City of New York, Commissioner William J. Diamond, and the New York City Department of Citywide Administrative Services (collectively, the "defendants") for approval of a proposed Settlement Agreement (the "Agreement"). At issue in this case is the number of blacks, Hispanics, Asians, and women hired for the positions of School Custodian ("Custodian") and School Custodian Engineer ("Custodian Engineer") in New York City schools. The Agreement reflects a settlement of all of plaintiff's claims against the defendants based on alleged violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* For the reasons stated below, the motion for approval of the Agreement is granted.

### Background and Procedural History

The United States filed this action on January 30, 1996, alleging that defendants (1) failed and/or refused to recruit blacks, Hispanics, Asians, and women on the same basis as white, non-Hispanic men for the positions of Custodian and Custodian Engineer; (2) failed and/or refused to hire and promote blacks and Hispanics on the same basis as whites for the positions of Custodian and Custodian Engineer; and (3) used entry-level and promotional written examinations for the positions of Custodian and Custodian Engineer that disproportionately excluded blacks and Hispanics from employment and have not been shown to meet the requirements of federal law. The United States has since pursued two claims in this litigation: (1) a disparate impact claim on behalf of blacks and Hispanics,

which challenged defendants' administration and use of written, competitive civil service examinations Nos. 5040 (given in 1985), 8206/8209 (given in 1989), and 1074 (given in 1993) for the positions of Custodian and Custodian Engineer (the "testing claim"); and (2) a disparate impact claim on behalf of blacks, Hispanics, women, and Asians, which challenged defendants' recruitment practices for the positions of Custodian and Custodian Engineer (the "recruitment claim").

Fact discovery and expert discovery regarding the testing claim closed on October 3, 1997 and July 10, 1998, respectively.[1] Discovery concerning the recruitment claim commenced on June 22, 1998 and was in progress, with new fact and expert discovery deadlines awaiting the court's determination, when the parties informed the court of this settlement. The parties then voluntarily suspended further discovery while final settlement negotiations took place. The executed Settlement Agreement was filed with the court on February 11, 1999.

Pursuant to 42 U.S.C. § 2000e–2(n), the parties provided notice to those persons whose interests may be affected by the Agreement. According to the terms of the Agreement, defendants provided notice of the Agreement and the method for submitting objections to the following by first-class mail to their last known home address: (1) all Custodians and Custodian Engineers [2]; (2) Local 891 of the International Union of Operating Engineers ("Local 891"), the union that represents both provisional and permanent Custodians and Custodian Engineers; (3) individuals who remain on the eligible list for Custodian Examination No. 1074; and (4) all individuals who took Custodian Engineer (BOE) Examination No. 7004 on December 20, 1997. In sum, defendants provided actual notice of the Agreement to approximately 2,535 individuals. Defendants also posted notices regarding the Agreement at the Board of Education, the Department of Citywide Administrative Services, and all New York City public schools. In addition, defendants arranged for published notices regarding the Agreement, twice during two consecutive weeks, to appear in The New York Times, The New York Post, The Daily News, The Chief, The Amsterdam News, The Chinese World Journal, Korea Times, India Abroad, and El Diario.

Furthermore, on March 3, 1999, representatives of the parties met with the officers of Local 891 to explain the terms of the Agreement and to answer the officers' questions regarding the settlement. Thereafter, plaintiff provided Local 891 with approximately 600 copies of the Agreement for distribution to the union's membership. Finally, counsel for plaintiff attended a meeting of the Local 891 membership on April 8, 1999, at which counsel explained the terms of the Agreement, answered questions, and heard comments from the union membership.

Objections were due on April 27, 1999, and the United States received a total of 321 individual objections.[3] In addition to filing timely objections, three current permanent employees—John Brennan, James G. Ahearn, and Kurt Brunkhorst—have moved to intervene in this action pursuant to Rule 24(a) of the Federal Rules of Civil

---

**1.** One dispute regarding defendants' application to submit an additional expert report in the testing claim remained unresolved and was pending resolution at the time of the settlement.

**2.** As of June 30, 1999, there were 438 permanent Custodians and 391 permanent Custodian Engineers. (Decl. of James Lonergan, sworn to May 20, 1999, ¶ 3 (annexed as Ex. 1 to Def.'s Settlement Mem.).)

**3.** This number includes ten objections that were postmarked after April 27, 1999 but raise the same or similar issues as objections submitted in a timely manner. It does not, however, include 18 duplicate objections, or approximately 29 form objections that were received by the defendants but not by the United States. Of the 321 objectors, 183—or 57 percent—sent one or both of two form letters.

Procedure. Notably, Local 891 has not objected to the Agreement.

By order dated March 4, 1999, in response to a joint motion to schedule a fairness hearing to consider objections to the Agreement, the Honorable Frederic Block, United States District Judge, referred this matter to me to conduct a fairness hearing. I conducted the hearing on May 27, 1999, pursuant to Section 108 of the Civil Rights Act of 1991.[4] At the fairness hearing, the court heard testimony and arguments against approval from numerous objectors, some appearing *pro se* and some represented by counsel, and arguments in support of the Agreement from both the United States and defendants. Subsequently, by Stipulation dated June 2, 1999, the parties consented to have this case referred to a Magistrate Judge for all purposes. *See* 28 U.S.C. § 636(c).

### Central Terms of the Settlement Agreement

The Agreement resolves both the testing and recruitment claims, as well as all issues that were or could have been raised by the United States in its complaint. It comes after three years of highly contentious discovery, entailing the retention of numerous experts by both sides, the production of thousands of pages of documents, the taking of approximately thirty depositions, many applications to the court regarding discovery disputes, and over three months of arms-length settlement negotiations.[5] The Agreement's central provisions are as follows:

- Defendants cannot discriminate on the basis of race, national origin or gender in the recruitment or the selection of any employee, applicant or prospective applicant for employment, for the positions of Custodian and Custodian Engineer with the New York City Board of Education. (Agreement ¶ 7.)

- Defendants must implement a comprehensive recruitment program designed to increase the number of qualified black, Hispanic, Asian and female applicants for employment as Custodians and Custodian Engineers with the New York City Board of Education. This recruiting program includes: the placement of prominent job advertisements in The Daily News, The New York Times, The New York Post, The Amsterdam News, The Chinese World Journal, Korea Times, India Abroad and El Diario; placement of job advertisements on radio stations whose audiences reflect a significant black, Hispanic, or Asian listenership; and the distribution of future examination no-

---

4. Section 108 states, in pertinent part:

> (1)(A) Notwithstanding any other provision of law, and except as provided in paragraph (2), an employment practice that implements and is within the scope of a litigated or consent judgment or order that resolves a claim of employment discrimination under the Constitution or Federal civil rights laws may not be challenged under the circumstances described in subparagraph (B)
>
> (B) A practice described in subparagraph (A) may not be challenged in a claim under the Constitution or Federal civil rights laws—
>
> > (i) by a person who, prior to the entry of the judgment or order described in subparagraph (A), had—(I) actual notice of the proposed judgment or order sufficient to apprise such person that such judgment or order might adversely affect the interests and legal rights of such person
> >
> > and that an opportunity was available to present objections to such judgment or order by a future date certain; and (II) a reasonable opportunity to present objections to such judgment or order; or
> >
> > (ii) by a person whose interests were adequately represented by another person who had previously challenged the judgment or order on the same legal grounds and with a similar factual situation, unless there has been an intervening change in law or fact.
>
> 42 U.S.C. §§ 2000e–2(n).

5. In addition, prior to filing this action on January 30, 1996, the United States Department of Justice conducted an extensive investigation of the New York City Board of Education school custodian system over a period of several years. After attempts to enter into a Consent Decree failed, the United States commenced this litigation.

tices to over 100 community organizations. (Agreement ¶¶ 18–24.)

- Defendants cannot use the four written examinations challenged in the lawsuit again, or any written examination derived substantially from the four examinations. (Agreement ¶ 25.)

- Defendants may hire off of the eligible list for Exam No. 1074 provided 31 vacancies are reserved for Custodians to be converted to permanent status. (Agreement ¶ 27.)

- Defendants cannot establish an eligible list from Exam No. 7004 (administered in December 1997) until they consult with the United States' designated expert on ways to reduce the examination's adverse impact and provided that 12 positions are reserved for Custodian Engineers to be converted to permanent status. (Agreement ¶ 27.)

- If defendants develop new written examinations during the life of the Agreement, they must consult with the United States' designated expert. In addition, any new written examinations must comply with the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607 et seq. (1998) ("Uniform Guidelines"). (Agreement ¶ 28.)

- Defendants must provide permanent, civil service status to *43* identified blacks, Hispanics, Asians, and women who have been serving provisionally as Custodians and Custodian Engineers. In addition to converting 43 temporary or "provisional" employees to permanent employees, defendants must provide retroactive seniority, including retroactive pension relief, to *54* identified black, Hispanic, Asian, and female incumbent Custodians and Custodian Engineers (including the 43 provisional employees). These individuals will receive retroactive seniority dates ranging from January 23, 1989 through February 28, 1996. (Agreement ¶¶ 12–19.)

- The Agreement, and the Court's jurisdiction over the action, will expire in February 2003. During its life, defendants periodically must provide the United States with reports and documentation to ensure compliance with the terms of the Agreement. (Agreement ¶¶ 43–47.)

## DISCUSSION

The United States brought this action pursuant to section 707(a) of Title VII, 42 U.S.C. §§ 2000e–6(a), which authorizes the United States Attorney General to bring a civil action whenever she has reasonable cause to believe that a public employer is engaged in a "pattern or practice" of discriminatory conduct. The standard of review for approval of a settlement of an action brought under this section is whether the proposed agreement is lawful, fair, reasonable, adequate, and consistent with the public interest. *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir.1985); *Vulcan Soc'y of the New York City Fire Dep't, Inc. v. City of New York*, 96 F.R.D. 626, 629 (S.D.N.Y.1983). In addition, where, as here, a settlement implements race-conscious remedies, the court reviewing the settlement must determine whether (1) there is an existing condition that serves as a proper basis for the creation of race-conscious remedies; and (2) the specific remedies of the compromise agreement are reasonable and lawful. *See Kirkland v. New York State Dep't of Correctional Servs.*, 711 F.2d 1117, 1129 (2d Cir.1983).

The court has considerable discretion in determining whether to approve a settlement. *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 454 (2d Cir.1974); *Newman v. Stein*, 464 F.2d 689, 692–93 (2d Cir.1972). In exercising its discretion, however, the court must bear in mind the general preference for cooperation and voluntary compliance as a means of ensuring equal employment opportunities and eliminating discriminatory practices. *See Local No. 93, Int'l Ass'n of Firefighters v. City of*

*Cleveland,* 478 U.S. 501, 515, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986) ("Congress intended voluntary compliance to be the preferred means of achieving the objectives of Title VII"); *Carson v. American Brands, Inc.,* 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981) ("In enacting Title VII, Congress expressed a strong preference for encouraging voluntary settlement of employment discrimination claims"); *Hiram Walker & Sons,* 768 F.2d at 888–89 (the "general policy favoring voluntary settlements of class action disputes" is "even more forcefully applicable in Title VII cases because of Congress' express preference for settlement in such cases"); *Kirkland,* 711 F.2d at 1128 ("It is settled that voluntary compliance is a preferred means of achieving Title VII's goal of eliminating employment discrimination"). Indeed, voluntary settlements in Title VII cases enjoy a "presumption of validity" that can be overcome "only if the decree contains provisions which are unreasonable, illegal, unconstitutional, or against public policy." *United States v. City of Alexandria,* 614 F.2d 1358, 1362 (5th Cir.1980). *See also Berkman v. City of New York,* 705 F.2d 584, 597 (2d Cir. 1983); *Reid v. State of New York,* 570 F.Supp. 1003, 1004 (S.D.N.Y.1983). This presumption is especially strong when the consensual agreement at issue has been reached by a federal government agency charged with protecting the public interest and seeing that anti-discrimination laws are enforced and violations remedied. *See United States v. City of Miami,* 614 F.2d 1322, 1332–33 (5th Cir.1980).

The presumption of validity applies to Title VII settlement agreements because they " 'may produce more favorable results for protected groups than would more sweeping judicial orders that could engender opposition and resistance' and because 'they also reduce the cost of litigation, promote judicial economy, and vindicate an important societal interest in promoting equal opportunity.' " *Kirkland,* 711 F.2d at 1128 n. 14 (citations omitted). An objector seeking to rebut the presumption

therefore bears a "heavy burden of demonstrating that the decree is unreasonable." *Williams v. Vukovich,* 720 F.2d 909, 921 (6th Cir.1983).

In order to satisfy the standard of reasonableness, the proposed remedies "must be substantially related to the objective of eliminating the alleged instance[s] of discrimination ..., and must not unnecessarily trammel the interests of affected third parties." *Kirkland,* 711 F.2d at 1132. *See also In re Masters Mates & Pilots Pension Plan and IRAP Litig.,* 957 F.2d 1020, 1026 (2d Cir.1992) ("Where the rights of third parties are affected, ... their interests too must be considered"). However, in deciding whether a settlement meets this standard, the court should "refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights." *Hiram Walker & Sons,* 768 F.2d at 889 (citing *Dawson v. Pastrick,* 600 F.2d 70, 75 (7th Cir.1979), and *Bryan v. Pittsburgh Plate Glass Co. (PPG Indus. Inc.),* 494 F.2d 799, 801 (3d Cir.1974)). *See also Carson,* 450 U.S. at 88 n. 14, 101 S.Ct. 993 (courts reviewing settlements "do not decide the merits of the case or resolve unsettled legal questions"); *Flinn v. FMC Corp.,* 528 F.2d 1169, 1172 (4th Cir.1975) ("The trial court should not ... turn the settlement hearing 'into a trial or a rehearsal of the trial' ") (quoting *Teachers Ins. & Annuity Ass'n of Am. v. Beame,* 67 F.R.D. 30, 33 (S.D.N.Y.1975)) (additional citations omitted). In addition, the court should not "make the proponents of the agreement justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained...." *EEOC v. The New York Times Co.,* 92 Civ. 6548, 1995 WL 135577, at *4 (S.D.N.Y. March 29, 1995) (quoting *Milstein v. Werner,* 57 F.R.D. 515, 524–25 (S.D.N.Y.1972)). At the same time, the court "is expected to make a sufficient exploration of the facts and circumstances surrounding the voluntary disposition of the case to be able to make a rational

determination concerning the settlement's propriety." *Hispanic Soc'y of the New York City Police Dep't v. New York City Police Dep't*, 84 Civ. 6628, 1986 WL 7014, at * 3 (S.D.N.Y. June 16, 1986) (citing *Plummer v. Chemical Bank*, 668 F.2d 654, 658 (2d Cir.1982)).

■ In this case, none of the facts that tend to cause courts to view consent decrees and settlement agreements with skepticism is present. Those include the allocation of most or all of the settlement benefits to named class plaintiffs or charging parties seeking to profit at the expense of unrepresented individuals (*see, e.g., Holmes v. Continental Can Co.*, 706 F.2d 1144, 1147 (11th Cir.1983)), the filing of a proposed agreement early in the case, before significant discovery has taken place (*e.g., In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1128 (7th Cir.1979); *Plummer*, 668 F.2d at 658; *Dembski v. Fairchild Indus., Inc.*, No. 88 CV 2953, 1989 WL 159510, at *13 (E.D.N.Y. Dec.18, 1989)), or an allegation that the attorneys involved have sacrificed their clients' interests to assure themselves sizable attorney's fees. *See Oswald*, 594 F.2d at 1130; *Patterson v. Stovall*, 528 F.2d 108, 112 (7th Cir.1976), *overruled on other grounds, Felzen v. Andreas*, 134 F.3d 873 (7th Cir.1998). Nonetheless, an evaluation of the merits of the settlement and the various categories of objections is required.

### A. *The Agreement*

As explained above, the Agreement provides for both prospective and remedial relief. In order to determine the propriety of the proposed measures, it is first necessary to understand the hiring and promotion practices of the New York City Board of Education for those employed as Custodians and Custodian Engineers.

The New York City Board of Education periodically conducts civil service examinations for the positions of permanent Custodian and Custodian Engineer. (Cert. of John Brennan, dated April 30, 1999, ¶ 4.) After taking and passing the relevant examination, applicants are placed on an eligibility list for open positions. Once employees are hired for those positions, they are assigned seniority rankings based on their dates of hire and their test scores. (*Id.*)

An employee's seniority ranking is one factor that determines whether that employee will be selected to work in a particular school for which he or she has bid. (Decl. of Bernard R. Siskin, dated May 24, 1999 ("Siskin Decl."), ¶ 2.) The salaries of Custodians and Custodian Engineers are then dependent on the particular school where each employee works. (*Id.* ¶ 3.) Each school has a maximum permissible salary ("MPR"),[16] which is primarily a function of the size of the building; the larger the square footage of the building, the higher the MPR. (*Id.*) The applicable collective bargaining agreement establishes guidelines on eligibility for building sizes based on an employee's permanent seniority as follows:

### I. Custodians

| Years of Employment (Seniority Band) | Building Size |
| --- | --- |
| 1–5 | 0 square feet—50 M square feet |
| 6–10 | 51 M square feet—75 M square feet |
| 11 or more | 76 M square feet—82 M square feet |

### II. Custodian Engineers

| Years of Employment (Seniority Band) | Building Size |
| --- | --- |
| 1–5 | 76 M square feet—100 M square feet |
| 6–10 | 101 M square feet—130 M square feet |
| 11–15 | 131 M square feet—200 M square feet |
| 16 or more | Over 201 M square feet |

(*Id.* ¶ 3.) The current MPRs for schools of various sizes are as follows:

| Size of School | Maximum Permissible Salary |
| --- | --- |
| 50 M square feet | $59,408 |
| 75 M square feet | $62,224 |
| 82 M square feet | $62,806 |
| 100 M square feet | $65,079 |
| 130 M square feet | $68,851 |
| 200 M square feet | $75,701 |
| Over 276 M square feet | $82,371 |

---

**16.** MPR is the acronym used by the New York City Board of Education for maximum permissible salary. (Siskin Decl. ¶ 3 n. 1)

*Id.* The salaries of employees are further restricted in the first years of employment as follows:

| Time in Service | Salary Rate |
| --- | --- |
| Start | 70% of MPR |
| After 1 year | 75% of MPR |
| After 2 years | 80% of MPR |
| After 3 years | 85% of MPR |
| After 4 years | 90% of MPR |
| After 5 years | 100% of MPR |

(*Id.* ¶ 4.) To determine the applicable salary rate, the Board of Education uses the employee's first date of service, either provisionally or permanently. (*Id.*)

Custodians and Custodian Engineers compete for building assignments based on their relative seniority within seniority categories and their performance ratings. (*Id.* ¶ 5.) Lists of available openings, known as "Transfer Lists," are released approximately five times per year. (*Id.*) Eligible employees then bid for the openings in which they are interested. (*Id.*) A permanent Custodian or Custodian Engineer may request a transfer to any school that is listed as available for his or her job title. If more than one employee within the same 5–year seniority band bids to transfer to a particular school, an employee's performance rating is the first determinant for selection. Employees whose average performance ratings (of the last four ratings) are within .25 of each other are considered equivalent. Among employees with equivalent ratings, seniority then becomes the deciding factor in awarding the position. (*Id.*) In fact, seniority is the deciding factor in approximately ninety (90) percent of school assignment decisions. (*Id.*) The names of the top five bidders for any school on the Transfer List are then submitted to the community superintendent and the local school boards; the person who is number one on the list receives the transfer unless the superintendent or the school board objects. (Declaration of James Lonergan, dated May 20, 1999 ("Lonergan 5/20/99 Decl."), ¶ 24.) [17]

The hiring process for provisional employees is different from the process for hiring permanent employees. The Board of Education regularly receives resumes from individuals applying for provisional Custodian and Custodian Engineer positions. (Lonergan 5/20/99 Decl. ¶ 4.) In addition, the Board of Education occasionally places advertisements for provisional Custodian and Custodian Engineer positions. (*Id.*) When the Board of Education has provisional positions available, the Board of Education's Department of Human Resources reviews the resumes to determine whether individual applicants meet the applicable minimum qualifications, which are the same as for permanent Custodians and Custodian Engineers. (*Id.* ¶¶ 5, 6.) Applicants considered to be most qualified are then selected for interviews based on the particular needs of the school with the job opening. (*Id.* ¶ 6.) [18] Such interviews are then conducted by committees consisting of individuals from the De-

---

**17.** Seniority also affects "temporary care" assignments, which occur when a school building becomes vacant, meaning that there is no full-time permanent Custodian or Custodian Engineer, provisional Custodian or Custodian Engineer, or private contractor in attendance. (Lonergan 5/20/99 Decl. ¶¶ 22–23.) Under the temporary care system, a Custodian or Custodian Engineer is responsible for both his or her permanent assignment and the temporary assignment, and is paid for both. For the first six months of a temporary care assignment, a Custodian or Custodian Engineer receives 75 percent of double salary while devoting no extra time to the job; thereafter he or she receives a full double salary. (*Id.* ¶ 23.) Each borough office maintains a temporary care list, based on seniority, for the district in which the school is located. Per-

manent Custodians and Custodian Engineers become eligible for temporary care assignments after one year of service in the position. (*Id.* ¶ 24.) According to the unchallenged declaration of James Lonergan, Director of Plant Operations for the New York City Board of Education, a Custodian or Custodian Engineer "may reasonably expect to receive a temporary care assignment approximately once every two years" and in general such assignments "may be expected to last for two months." (*Id.* ¶ 22.)

**18.** For example, if a particular school requires a Custodian or Custodian Engineer with a refrigeration license, only applicants who hold that license will be considered. (Lonergan 5/20/99 Decl. ¶ 7.)

partment of Human Resources, the Office of the Chief Executive of the Division of School Facilities, and a technical representative. (*Id.* ¶ 10.) The committees then make recommendations for hiring to the Board of Education's Director of Plant Operations. (*Id.*) [19]

Once hired, provisional and permanent Custodians and Custodian Engineers receive the same orientation training and the same performance evaluations. (*Id.* ¶¶ 12, 13.) Thus, all permanent and provisional Custodians and Custodian Engineers are evaluated every six months by both the principal of the school and the plant manager who is the employee's immediate supervisor. (*Id.* ¶ 14.) [20]

The key difference between provisional hires and permanent Custodians and Custodian Engineers is that provisional employees do not have civil service rights. (*Id.* ¶ 15.) This means that a provisional employee may be terminated immediately upon receiving an unsatisfactory performance evaluation and will not be afforded a probationary period. (*Id.*) In addition, provisional Custodians and Custodian Engineers are assigned to schools based on the Board of Education's need to fill vacancies when there is no permanent hiring list available, or when privatization is in process. (*Id.* ¶ 16.) Unlike permanent Custodians and Custodian Engineers, pro-

visional employees may be replaced or transferred unwillingly, and may not bid for schools on the transfer lists. (*Id.* ¶ 19.)

One of the hotly contested provisions in the proposed settlement would give certain individuals permanent positions with retroactive seniority dates.[21] Those individuals, referred to in the Agreement as "Offerees," include:

(a) All Custodians or Custodian Engineers who are listed in the Stipulation Regarding Provisional Hires as black, Hispanic, Asian, or female and are still employed as Custodians or Custodian Engineers, either provisionally or permanently, as of the date of the approval of this Settlement Agreement by the Court; and

(b) All black, Hispanic, Asian, or female Custodians or Custodian Engineers who are not listed in the Stipulation Regarding Provisional Hires but are employed as provisional Custodians or Custodian Engineers as of the date of the approval of this Settlement Agreement by the Court and took one or more of the Challenged Examinations.

(Agreement, ¶ 4.) Thus, all of the Offerees have served as provisional Custodians or Custodian Engineers, and all are still serving in those positions, either provisionally or permanently.[22] Moreover, documents

---

**19.** The interviewing and selection procedures for provisional hires changed in 1995. Prior to mid-1995, interviews for provisional Custodian and Custodian Engineer positions were conducted by the Chief of Custodians and his or her assistant. Following those interviews, the Chief of Custodians would submit recommendations for hiring to the Department of Human Resources, which would review the applicants' qualifications. (Lonergan 5/20/99 Decl. ¶ 9.)

**20.** For purposes of a permanent employee's eligibility for transfer, however, only the school principal's rating applies. (Lonergan 5/20/99 Decl. ¶ 20.)

**21.** In some cases, retroactive seniority will be measured from the date that the Offeree was hired as a provisional employee in his or her current job title; in the remaining cases, the Offerees' retroactive seniority will be mea-

sured from a date related to one of the examinations challenged in this case. For the latter group, the parties agreed to a "Median Date" for retroactive seniority. The Median Date is the midpoint of the hiring period for a challenged examination. Remedial seniority for those Offerees will therefore fall in between the first and final hiring dates for employees who took the challenged examination.

**22.** Notably, the Agreement does *not* offer make-whole relief to individuals who (1) failed any of the challenged examinations and were never hired as provisional employees, (2) would have been qualified and interested in the Custodian and Custodian Engineer positions but were unaware of such positions, or (3) knew about the positions but were deterred from applying because of the Board of Education's reputation for hiring few minorities and women. Thus, the number of indi-

submitted to the court demonstrate that all of the Offerees have received average job performance ratings of "satisfactory" or higher, with most of the Offerees receiving average ratings of "good" or "excellent." (*See* Declaration of James Lonergan, dated June 30, 1999, ¶¶ 4, 5.) This suggests that all of the Offerees are qualified for the positions they would occupy under the terms of the Agreement.

### 1. *Prima Facie Case*

■ In evaluating a settlement agreement, "the reasonableness and legality of the agreement under federal law must be measured against the allegations of the complaint and the relief which might have been granted had the case gone to trial." *Kirkland,* 711 F.2d at 1132. "The probability of plaintiff's success on the merits and the range of possible relief are factors that courts have considered important" in determining whether to approve a Title VII settlement. *Id.* at 1129.

■ As the parties explain in their submissions, a *prima facie* showing of adverse racial impact is sufficient to establish a "probability of success on the merits." *Id.* at 1131. It is well-settled that such a showing "may be established by statistical evidence showing that an employment practice has the effect of denying the members of one race equal access to employment opportunities." *New York City Transit Auth. v. Beazer,* 440 U.S. 568, 584, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979). *See also Albemarle v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975) (*prima facie* case of adverse impact established by proof "that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants"); *Bushey v. New York State Civil Serv. Comm'n,* 733 F.2d 220, 227 (2d Cir.1984) (" 'a prima facie case of employment discrimination through a statistical demonstration of dispropor-

tionate racial impact constitutes a sufficiently serious claim of discrimination to serve as a predicate for voluntary compromise containing race-conscious remedies' ") (quoting *Kirkland,* 711 F.2d at 1130); *Guardians Ass'n of New York City Police Dep't, Inc. v. Civil Serv. Comm'n,* 630 F.2d 79, 88 (2d Cir.1980) ("statistics showing a significantly disparate racial impact have consistently been held to create a presumption of Title VII discrimination"); *United States v. County of Fairfax,* 629 F.2d 932, 939 (4th Cir.1980) ("statistics can establish a *prima facie* case [in a disparate treatment case], even without a showing of specific instances of overt discrimination"); *Vulcan Soc'y,* 490 F.2d at 392–93 (upholding district court's finding of adverse impact by comparing test passing rates of minority and non-minority candidates); *Green v. Town of Hamden,* 73 F.Supp.2d 192, 197–98 (D.Conn.1999) (finding a *prima facie* case of disparate impact based on statistics showing a significant disparity in examination pass rates between minorities and non-minorities). There is no requirement that plaintiff prove that the tests were intentionally discriminatory or non-job-related in order to receive judicial approval of the settlement. *Reid v. State of New York,* 570 F.Supp. 1003, 1006 (S.D.N.Y.1983).

■ Plaintiff has pursued two claims in this action—a testing claim and a recruitment claim—and must make out a prima facie case for each:

### a) *Testing Claim*

Plaintiff challenges three civil service examinations as disproportionately excluding blacks and Hispanics from the positions of Custodian and Custodian Engineer. Those examinations are Exam 5040 (given in 1985), Exam 8206/8209 (given in 1989), and Exam 074 (given in 1993). In order to make a *prima facie* showing of disparate impact on its testing claim, plain-

viduals who will receive permanent appointments is relatively small in comparison with the number of individuals who would poten-

tially have been entitled to relief had this matter proceeded to a final adjudication on the merits.

tiff must demonstrate a statistically significant disparity between the percentage of the protected group taking the test and the percentage of that group passing the test. *See, e.g., Guardians Ass'n,* 630 F.2d at 85. For purposes of the joint motion for approval of the Agreement, it is undisputed that the following pass rates apply for Examinations 5040, 8206, and 1074, at issue in this case: [15]

### I. Exam 5040 (1985)

| | Number Who Took Exam | Number Who Passed | Percentage Who Passed |
|---|---|---|---|
| Total | 2013 | 877 | 44.8% |
| Whites | 1161 | 674 | 58.1% |
| Blacks | 319 | 45 | 14.1% |
| Hispanics | 213 | 59 | 27.7% |

### II. Exam 8206 (1989)

| | Number Who Took Exam | Number Who Passed | Percentage Who Passed |
|---|---|---|---|
| Total | 455 | 369 | 81.1% |
| Whites | 316 | 269 | 85.1% |
| Blacks | 40 | 20 | 50.0% |
| Hispanics | 45 | 32 | 71.1% |

### III. Exam 1074 (1993)

| | Number Who Took Exam | Number Who Passed | Percentage Who Passed |
|---|---|---|---|
| Total | 1448 | 727 | 50.2% |
| Whites | 960 | 592 | 61.7% |
| Blacks | 216 | 31 | 14.4% |
| Hispanics | 208 | 64 | 30.8% |

For Examination 5040, the pass rate for black test-takers divided by the pass rate for white test-takers is less than .80, as is the pass rate for Hispanic test-takers divided by the pass rate for white test-takers. (Defs.' Resp. to Pl.'s First Set of Reqs. for Admissions ("Expert Admissions"), annexed as Ex. B to the Decl. of Aaron D. Schuham, Esq., ¶¶ 82, 83.) The disparity between the pass rate for black test-takers and that for white test-takers on the 5040 Exam, using the chi-square test corrected for continuity,[16] is 13.85 standard deviations,[17] and is statistically significant at the .05 level. (*Id.* ¶¶ 84, 85.) The disparity between the pass rate for Hispanic test-takers and that for white test-takers on the 5040 Exam, using the

**15.** The following tables rely on data contained in a report by defendant's expert, Philip Bobko, Ph.D., entitled "Rebuttal Analysis of Siskin and Cupingood's 11/97 Report Regarding Adverse Impact (if Any) for Custodian and Custodian Engineer Exams," submitted in April 1998. The levels of adverse impact are even greater applying the data of plaintiff's statistical experts, Bernard R. Siskin, Ph.D. and Leonard A. Cupingood, Ph.D., in their report entitled "Adverse Impact on Minorities of Written Examinations for Custodian and Custodian Engineer Positions in New York City 1985–1993," submitted in November 1997.

**16.** In *King v. General Elec. Co.,* 960 F.2d 617 (7th Cir.1992), the Seventh Circuit explained:

A chi-square test evaluates the disparity between the expected and observed frequency of a certain outcome. For example, suppose that of the individuals terminated at a given time, a greater percentage of them are within the protected age class. We want to determine whether the disparity in termination rates can be attributed to chance, or whether the disparity is so large, that some factor other than chance probably influence[s] the selection of the individuals terminated.... A[c]hi-square test will determine whether the chance or other factors influenced the outcome.

*Id.* at 626 n. 5 (citing WALTER CONNOLLY, JR. ET AL., USE OF STATISTICS IN EM-

PLOYMENT OPPORTUNITY LITIGATION § 10.05[2] (1991)). Likewise, in *NAACP v. City of Mansfield, Ohio,* 866 F.2d 162 (6th Cir.1989), the Sixth Circuit explained:

A chi-square value is a test of association which measures deviations from expected behavior. Certain deviations are expected to occur as a pattern of chance. However, at some point a discrepancy becomes so large that it is no longer expected to occur as a result of chance alone. The chi-square value for any two series is determined from a standard statistical table. Where a discrepancy becomes larger than that number, it means that the differences have not occurred as a result of chance alone. However, if the chi-square value becomes smaller than that number, the change is probably a result of chance variations.

*Id.* at 167.

**17.** The standard deviation for a particular set of data provides a measure of how much the particular results of that data differ from the expected results. In other words, the standard deviation is a measure of the average variance of the sample, that is, the amount by which each item deviates from the mean. The number of standard deviations by which the actual results differ from the expected results can be compared to the normal distribution curve, yielding the likelihood that the difference would have been the result of chance. *Guardians Ass'n,* 630 F.2d at 86 n. 4.

chi-square test corrected for continuity, is 8.09 standard deviations, and is also statistically significant at the .05 level. (*Id.* ¶¶ 86, 87.)

For Exam 8206, the pass rate for black test-takers divided by the pass rate for white test-takers is less than .80. (*Id.* ¶ 92.) The disparity between the pass rate for white test-takers and that for black test-takers, using the chi-square test corrected for continuity, is 5.14 standard deviations, and is statistically significant at the .05 level. (*Id.* ¶¶ 93, 94.) The disparity between the pass rate for Hispanic test-takers and that for white test-takers on the 8206 Exam, using the chi-square test corrected for continuity, is 2.15 standard deviations, and is also statistically significant at the .05 level. (*Id.* ¶¶ 95, 96.)

Finally, for Exam 1074, the pass rate for black test-takers divided by the pass rate for white test-takers is less than .80, as is the pass rate for Hispanic test-takers divided by the pass rate for white test-takers. (*Id.* ¶¶ 101, 102.) The disparity between the pass rate for white test-takers and that for black test-takers, using the chi-square test corrected for continuity, is 12.51 standard deviations, and is statistically significant at the .05 level. (*Id.* ¶¶ 103, 104.) The disparity between the pass rate for Hispanic test-takers and that for white test-takers on the 8206 Exam, using the chi-square test corrected for continuity, is 8.06 standard deviations, and is also statistically significant at the .05 level. (*Id.* ¶¶ 105, 106.)

The wide disparities between the pass rates of white test-takers on the one hand, and black and Hispanic test-takers on the

other, are sufficient to establish a *prima facie* showing of adverse impact. *See Kirkland,* 711 F.2d at 1130. Indeed, none of the objectors contests that the racial and national origin composition of the eligibility lists for the challenged examinations statistically establishes a *prima facie* case of discrimination. There is therefore no dispute that the disparities in testing results have created a "condition which can serve as a proper basis for the creation of race-conscious remedies." *Id.* at 1129.

### b) *Recruitment Claim*

Plaintiff's recruitment claim alleges that defendants failed and/or refused to recruit blacks, Hispanics, Asians, and women on the same basis as white, non-Hispanic men for the positions of Custodian and Custodian Engineer. A plaintiff may make a *prima facie* showing of discrimination on a recruitment claim by demonstrating a gross disparity between the representation of the protected group in the relevant labor market and the representation of that group in the total number of applicants for the position at issue. *See, e.g., Association Against Discrimination in Employment, Inc. v. City of Bridgeport,* 479 F.Supp. 101, 106 n. 6. (D.Conn.1979), *aff'd in part, vacated in part on other grounds,* 647 F.2d 256 (2d Cir.1981). For purposes of the joint motion for approval of the Agreement, it is undisputed that the following tables accurately compare the representation of minority and female applicants for each of the challenged examinations with that in the available labor pools:[18]

#### I. *Exam 5040*

---

18. Although expert reports regarding the recruitment claim were not due and were not filed by the parties when this case settled, the court relies on the Declaration of plaintiff's expert in labor economics, Orley C. Ashenfelter, Ph.D., which neither defendants nor objectors rebut. Dr. Ashenfelter is the Joseph Douglas Green 1895 Professor of Economics at Princeton University, as well as the Editor of the American Economic Review, the official refereed publication of the American Economic Association. (Ashenfelter Decl. ¶ 1.) Dr. Ashenfelter received a Ph.D. in Economics from Princeton University in 1970, and a B.A. in Economics from Claremont McKenna College in 1964 (*id.* ¶ 2) and now teaches courses in econometrics and labor economics. (*Id.* ¶ 1.) Dr. Ashenfelter is therefore qualified to render an expert opinion in this case.

| | Estimated Representation in Labor Pool [19] | Expected Number of Minority or Female Applicants [20] | Actual Number of Minority or Female Applicants | Difference Between Expected and Actual | Z–Statistic [21] |
|---|---|---|---|---|---|
| Blacks | 24.9% | 439 | 341 | 98 | 5.41 |
| Qualified [22] Blacks | 23.8% | 231 | 97 | 134 | 10.10 |
| Hispanics | 24.9% | 439 | 218 | 221 | 12.16 |
| Qualified Hispanics | 22.5% | 218 | 101 | 117 | 9.00 |
| Asians | 3.2% | 56 | 15 | 41 | 5.61 |
| Qualified Asians | 3.3% | 32 | 7 | 25 | 4.46 |
| Females | 15.9% | 289 | 89 | 200 | 12.81 |
| Qualified Females | 12.2% | 119 | 37 | 82 | 8.02 |

## II. Exam 8026

| | Estimated Representation in Labor Pool | Expected Number of Minority or Female Applicants [23] | Actual Number of Minority or Female Applicants | Difference Between Expected and Actual | Z–Statistic |
|---|---|---|---|---|---|
| Blacks | 22.1% | 91 | 41 | 50 | 5.94 |
| Qualified Blacks | 22.2% | 71 | 29 | 42 | 5.64 |
| Hispanics | 17.6% | 73 | 42 | 31 | 3.95 |
| Qualified Hispanics | 17.6% | 56 | 29 | 27 | 4.00 |
| Asians | 4.9% | 20 | 8 | 12 | 2.76 |
| Qualified Asians | 4.9% | 16 | 5 | 11 | 2.77 |
| Females | 9.4% | 40 | 4 | 36 | 6.01 |
| Qualified Females | 9.4% | 32 | 3 | 29 | 5.35 |

## III. Exam 1074

| | Estimated Representation in Labor Pool | Expected Number of Minority or Female Applicats [24] | Actual Number of Minority or Female Applicants | Difference Between Expected and Actual | Z–Statistic |
|---|---|---|---|---|---|
| Blacks | 21.4% | 300 | 215 | 85 | 5.54 |
| Qualified Blacks | 19.7% | 165 | 63 | 102 | 8.89 |
| Hispanics | 23.1% | 324 | 203 | 121 | 7.66 |
| Qualified Hispanics | 19.7% | 165 | 96 | 69 | 6.03 |
| Asians | 6.0% | 84 | 25 | 59 | 6.65 |
| Qualified Asians | 6.0% | 53 | 14 | 39 | 5.53 |
| Females | 14.7% | 209 | 71 | 138 | 10.34 |
| Qualified Females | 12.0% | 102 | 30 | 72 | 7.62 |

19. Dr. Ashenfelter defined the available labor pool as the group of workers willing and able to perform the job in question. (Ashenfelter Decl. ¶ 4.) To estimate the representation of each group in the available labor pool, Dr. Ashenfelter consulted the Census of Population and Housing: Public Use Micro Data Sample A ("PUMSA"), a standard source for regional labor force availability data. (Id. ¶ 7.)

20. As compared with the total number of applicants. For Exam 5040, the total number of applicants for black, Hispanic, and Asian applicants was 1,766 (969 qualified), and for females the total was 1,817 (978 qualified). (Ashenfelter Decl. Table 6.)

21. As Dr. Ashenfelter explains, A Z-statistic of 1.96 or higher indicates that the probability of finding a difference this large or larger is five percent or smaller. When the Z-statistic is 1.96 or more, statisticians refer to the difference as "statistically significant" and reject the hypothesis that the difference is due to chance alone. (Ashenfelter Decl. ¶ 19.) The higher the Z-statistic, the smaller the probability that the difference is due to chance alone and, correspondingly, the larger the probability that the difference represents a systematic difference in the rates at which different groups apply. (Id. ¶ 20.)

22. Dr. Ashenfelter conducted the disparate impact analysis for the recruitment claim under two alternative scenarios: (1) using all test-takers; and (2) using only those test-takers deemed qualified by defendants, based on data analyzed and presented by Dr. Philip Bobko, defendants' statistics expert. In computing adverse impact, Dr. Bobko analyzed the relevant data based on defendants' determinations as to which test-takers satisfied defendants' minimum qualifications for the positions of Custodian and Custodian Engineer, as set forth in the Notices of Examination for the exams at issue. Throughout this litigation, plaintiff has objected to the use of this data, referred to as the "Bobko Qualification Data," on the ground that defendants' qualification review of test-failers was suspect and unreliable. The court need not resolve this issue for purposes of approving the settlement. It is noteworthy, however, that even applying the Bobko Qualification Data, defendants admit to the adverse impact of the three exams on blacks and Hispanics, with the exception of the 8206 Exam with respect to Hispanics. See Expert Admissions, ¶¶ 135–40, 145–47, 152–57.

23. As compared with the total number of applicants, which was 412 for blacks, Hispanics, and Asians (320 qualified) and 427 for females (332 qualified). (Ashenfelter Decl. Table 7.)

*(See* Ashenfelter Decl. Tables 6–8.)

Statistics alone may suffice to establish a *prima facie* showing because a statistically significant disparity leads to the inference that the underutilization or underrepresentation of minorities or women in the work force is not due to random chance, but may be attributable to discrimination. *See Teamsters,* 431 U.S. at 339, 97 S.Ct. 1843 (a racial or gender imbalance in the work force "is often a telltale sign of purposeful discrimination" since "absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the ... composition of the population of the community from which employees are hired"). Thus, although racially disproportionate impact need not be proven with complete mathematical certainty (*Kirkland,* 520 F.2d at 425), a disparity of two or three standard deviations or more generally is sufficient to establish a *prima facie* case of discrimination. *Castaneda v. Partida,* 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (in cases involving large samples, a *prima facie* case is established "if the difference between the expected value (from a random selection) and the observed number is greater than two or three standard deviations"). *See also Hazelwood Sch. Dist. v. United States,* 433 U.S. 299, 308 n. 14, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Teamsters,* 431 U.S. at 339 n. 20, 97 S.Ct. 1843; *Kirkland,* 711 F.2d at 1131; *Rivera v. City of Wichita Falls,* 665 F.2d 531, 536 n. 7 (5th Cir.1982); *Guardians,* 630 F.2d at 86–88. In addition, the Equal Employment Opportunity Commission's Uniform Guidelines on Employee Selection Procedures provide that a "selection rate for any race, sex, or ethnic group which is less than four-fifths (⅘) (or eighty percent) of the rate for the group with the highest rate will generally be regarded by the Federal enforcement agencies as evidence of adverse impact." 29 C.F.R. § 1607.4(D) (1979). For purposes of a disparate impact claim, whether the observed disparity occurred by design or merely by happenstance is irrelevant. *Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. 1843.

Here, as the above tables demonstrate, the disparities between the expected number of applicants for the identified groups and the actual observed number in many instances demonstrate standard deviations far in excess of two or three, indicating significant adverse impact.

### B. *Overall Fairness of the Agreement's Remedies*

 In addition to finding that the parties have made a *prima facie* showing of adverse impact, a court evaluating whether a Title VII settlement is lawful, fair, and reasonable may consider a number of factors, including the complexity, expense, and likely duration of the litigation, the stage of the proceedings, and the amount of discovery completed. *Grinnell Corp.,* 495 F.2d at 463. In this case, all of these factors weigh in favor of approving the Agreement. First, had this case gone to trial, the validity and job-relatedness of the challenged examinations would have been key issues and would have involved lengthy expert testimony. By entering

---

**24.** As compared with the total number of applicants, which was 1,399 for blacks, Hispanics, and Asians (840 qualified) and 1,417 for females (852 qualified). (Ashenfelter Decl. Table 8.)

into the Agreement, the parties avoided the need for a complex, expensive, and lengthy trial. Moreover, the parties negotiated this settlement at an advanced stage in the litigation, following the completion of extensive fact and expert discovery in the testing claim and substantial discovery regarding the recruitment claim.

■ In addition, a court evaluating the relief afforded identifiable victims of discrimination under a settlement agreement must be guided by one of the central purposes of Title VII, that is "... to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albemarle Paper Co.*, 422 U.S. at 418, 95 S.Ct. 2362. *See also Clarke v. Frank*, No. 88 CV 1900, 1991 WL 99211, at*2 (E.D.N.Y. May 17, 1991) ("The goal of Title VII remedies is to make people whole for injuries suffered as a result of unlawful discrimination"). To achieve this purpose, "Congress took care to arm the courts with full equitable powers" so that " '[t]he injured part[ies] ...[shall] be placed, as near as may be, in the situation [they] would have occupied if the wrong had not been committed.' " *Albemarle Paper Co.*, 422 U.S. at 419, 95 S.Ct. 2362 (quoting *Wicker v. Hoppock*, 73 U.S. (6 Wall.) 94, 99, 18 L.Ed. 752 (1867)). Specifically, the Supreme Court has held that a court's "broad equitable discretion" to effectuate Title VII's "make whole" objective includes the authority to "order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, ... or any other equitable relief as the court deems appropriate." *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) (citation omitted). In fact, " 'the court has not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future.' " *Albemarle Paper Co.*, 422 U.S. at 418, 95 S.Ct. 2362 (quoting *Louisiana v. United States*, 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709

(1965)). In other words, race-conscious relief is indisputably appropriate to remedy past discrimination. *Wygant v. Jackson Board of Ed.*, 476 U.S. 267, 277, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986); *Franks*, 424 U.S. at 775, 96 S.Ct. 1251.

Accordingly, courts have consistently upheld grants of retroactive seniority as an appropriate remedy in Title VII cases. *See, e.g., Local 28 of Sheet Metal Workers' Intern. Ass'n v. EEOC*, 478 U.S. 421, 481, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986) (upholding court's order requiring employer to use lists to select blacks before whites to remedy past discrimination as consistent with the equal protection safeguards of the Constitution where there was no absolute bar to white advancement but rather a delay in advancement); *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 399–400, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) (a district court may award retroactive seniority in a Title VII lawsuit, even over the objection of a union that has not itself been found to have engaged in discriminatory conduct); *Association Against Discrimination in Employment v. City of Bridgeport*, 647 F.2d 256, 287–88 (2d Cir. 1981) (equalizing promotional seniority by delaying promotional eligibility of incumbents); *Air Line Stewards and Stewardesses Ass'n v. Trans World Airlines, Inc.*, 630 F.2d 1164, 1169 (7th Cir.1980) (upholding settlement granting full retroactive seniority to female flight attendants); *City of Miami*, 614 F.2d at 1341("Just as a collective bargaining agreement may, for the purpose of furthering public policy interests beyond what is required by statute, enhance the seniority status of certain employees even though to some extent this will be detrimental to the expectations of other employees, ... so may an employer voluntarily consent to changes in seniority provisions ... to further important public policy interests"); *Vulcan Soc'y*, 96 F.R.D. at 630 ("the granting of seniority to those appointed [to permanent positions] under the terms of the settlement is appropriate where the parties have entered into a settlement that acknowledges the high possi-

bility that discriminatory practices were employed...."); *Ingram v. Madison Square Garden Ctr., Inc.,* 482 F.Supp. 918, 922 (S.D.N.Y.1979) ("the Supreme Court has made clear that, as a general matter, the District Court must ordinarily grant seniority relief" to ameliorate the effects of unlawful employment discrimination).

■ Thus, the retroactive seniority provisions in the Agreement are not novel or radical by any stretch. Rather, they are entirely consistent with and clearly meet Title VII's objective of eradicating discrimination. Furthermore, the relief is narrowly tailored, as only persons who are qualified for the positions of Custodian and Custodian Engineer will receive remedial relief, and no current permanent employee will be displaced. Indeed, the number of Offerees who will receive permanent positions is quite small in comparison with the number of individuals who may have been afforded relief had this matter proceeded to final adjudication. Plus, the Agreement does not establish any permanent numerical requirements or quotas; once the Offerees are converted to permanent status with retroactive seniority, the defendants will be required to recruit minority and female candidates actively and to hire on a non-discriminatory basis, but will not be required to achieve or maintain any specific percentage of minorities or women in the relevant workforce.

## C. *The Objections*

The outstanding objections to the Agreement fall into the following categories: (1) objections from current permanent employees who allege that retroactive seniority for the Offerees may adversely affect their relative seniority rights; (2) objections from current employees who complain that the Agreement's retroactive seniority provisions violate the New York Civil Service Law; (3) objections from individuals who are on the eligibility list for

Custodian Examination 1074, given in 1993, or took Custodian Engineer Examination 7004, given in 1997, and are concerned that fewer appointments will be available to them due to the appointments of the Offerees; (4) objections arguing that the Agreement's remedies are not sufficiently broad; (5) objections by non-Offerees claiming minority status or urging the expansion of the remedies to include additional individuals; and (6) miscellaneous objections concerning the calculation of retroactive seniority dates or other matters. The court will address each category in turn:

### 1. *Seniority Objections*

Approximately 194 objections come from permanent employees who complain that the Agreement's proposal to give certain provisional employees retroactive seniority dates will have an unfair impact on their ability to receive the building assignments they request and, correspondingly, on the salaries they will receive and on their pension benefits.[25] In other words, these objectors complain that the Agreement may have the effect of enlarging the pool of individuals competing for a given school.

Of course, it is very difficult to predict the actual economic effect the Agreement's grant of retroactive seniority may have on current permanent employees. First, as explained above, an employee's right to bid on a particular building assignment depends not only on that employee's seniority status, but also on his or her individual performance rating. More important, however, assignments depend on which schools become available when, and on the preferences of the employees eligible to bid on those particular buildings. For example, an employee may seek to secure a position at a school near his or her home, and may decline to bid on schools that are inconveniently located, even if those school buildings are larger and would ensure a

25. 126 of these objections are retroactive seniority form letters. With more or less detail, the remaining objections concerning seniority issues raise the same or similar arguments as those advanced in the form objections.

higher salary. Such personal choices are impossible to anticipate.

Although it is impossible to project into the future how seniority changes will effect the current group of Custodians and Custodian Engineers, the court defers to the unchallenged opinion of Bernard Siskin, Ph.D., plaintiff's statistics expert.[26] Dr. Siskin has performed a statistical analysis to estimate the historic effect that relative seniority has had on the current group of Custodians and Custodian Engineers, under the assumption that the observed historic effects will continue into the future. (Siskin Decl. ¶ 7.) Dr. Siskin analyzed the salaries of current permanent employees within each seniority group[27] and found that the average salary of Custodians with 1–5 years of seniority is $48,754, while Custodians with 6–10 years of seniority have an average salary of $62,028 and Custodians with 11 or more years of seniority have an average salary of $61,814. (Siskin Decl. ¶ 8.) Thus, the average salary of Custodians with 11 or more years of seniority is actually *less* than the average salary of Custodians with 6–10 years of experience. In addition, the lower average salary for Custodians with 1–5 years of seniority is largely a function of the Union contract restrictions on maximum salary in the first five years of employment, described above, and is not necessarily the result of differences in relative seniority within the group. (*Id.*)

In contrast with Custodians, average salaries for Custodian Engineers do tend to increase with seniority. Average salaries for Custodian Engineers are as follows:

| Seniority Band | Average Salary |
| --- | --- |
| 1–5 Years | $62,282 |
| 6–10 Years | $67,297 |
| 11–15 Years | $69,387 |
| 16 or More Years | $74,976 |

(*Id.* Table 2.) As Dr. Siskin points out, however, the differences in average salary between the middle two seniority bands are relatively small. Also, the lower average salary for the lowest seniority group is again explained, at least in part, by the salary restrictions in the first five years of employment. (*Id.* ¶ 9.)

To estimate the effect of relative seniority on salaries within seniority categories, Dr. Siskin computed a regression model for each of the above seniority groups. This model estimates the historic effect that relative seniority, or rank, has had on an employee's salary. (*Id.* ¶ 10.) For those with 1–5 years of seniority, Dr. Siskin controlled for the number of years of seniority that would restrict the employee's earnings pursuant to the Union contract. (*Id.*) The following tables represent the results of this regression analysis, *i.e.*, the estimated effect of seniority on salary within seniority bands:

### I. Custodians

| Seniority Band | Dollars | Standard Deviation | Statistically Significant? |
| --- | --- | --- | --- |
| 1–5 Years | $3.00 | 1.04 | No |
| 6–10 Years | ($9.00) | (0.52) | No |
| 11 or More Years | ($4.00) | (0.85) | No |

### II. Custodian Engineers

| Seniority Band | Dollars | Standard Deviation | Statistically Significant? |
| --- | --- | --- | --- |
| 1–5 Years | ($63.00) | (0.72) | No |
| 6–10 Years | $10.00 | 1.01 | No |
| 11–15 Years | $12.00 | 0.88 | No |
| 16 or More Years | $84.00 | 14.61 | Yes |

26. Dr. Siskin is a Senior Vice President of the Center for Forensic Economic Studies, Inc. in Philadelphia, Pennsylvania. He received his Ph.D. in Statistics, with a minor in Economics, from the Wharton School of the University of Pennsylvania in 1970. He has authored books on statistical methodology, as well as numerous articles and papers on the role of statistics in the analysis of employment discrimination issues, and he specializes in the application of statistics to the analysis of employment practices. In his capacity as a statistics expert, he has been retained to render opinions to numerous governmental and private organizations, including the Third Circuit Task Force on Race and Gender, the Equal Employment Opportunity Commission, the Office of Federal Contract Compliance Programs, and the Federal Bureau of Investigation. (Siskin Decl. ¶ 1.) He is therefore qualified to opine on the statistical matters at issue in this case.

27. Dr. Siskin used each employee's date of permanent assignment to determine his or her seniority status. (Siskin Decl. Table 2.)

(*Id.* Table 3.) Thus, according to Dr. Siskin's analysis, a Custodian's relative rank is not statistically significant for any seniority group, which means that greater relative seniority within a seniority group does not necessarily translate into greater earnings. (*Id.* ¶ 11.) As Dr. Siskin explains, this is not to say that seniority does not play an important role in determining a Custodian's placement. It is simply that other factors, such as employees' performance ratings or non-economic preferences, outweigh the effect of seniority. (*Id.*) Based on this statistical analysis, Dr. Siskin concludes that "current permanent custodians will not, on average, suffer any loss of earnings as a result of granting retroactive seniority" to the Offerees. (*Id.*)

As for Custodian Engineers, the analysis shows that relative rank has no statistically significant effect on salary for the first three seniority groups; however, there is a statistically significant relationship between relative seniority and salary for Custodian Engineers with 16 or more years of experience. (*Id.* ¶ 12.) Thus, the only group of permanent employees that could potentially experience a loss of earnings is Custodian Engineers with 16 or more years of service. (*Id.*) However, the Agreement does not give any of the Offerees sufficient retroactive seniority for inclusion within that seniority group right now. There will therefore be no loss of earnings for those Custodian Engineers currently in the highest seniority group; any potential loss of earnings would occur in the future, if and when the Offerees enter that category. At that point, Custodian Engineers with 16 or more years of service may lose some relative seniority to the Offerees. (*Id.*)

On average, the difference in salary between a Custodian Engineer in a lower seniority group and a Custodian Engineer in the next-higher seniority group is $84

per year. (*Id.* ¶ 12.) Using that estimated loss of earnings of $84 per year, and assuming that all employees work until they have 25 years of service,[28] Dr. Siskin calculated the estimated earnings loss for each current permanent Custodian Engineer that will result from the grant of retroactive seniority to the Offerees. First, he concluded that no Custodian Engineer will experience a loss of earnings if he or she has more seniority than any of the Offerees. (*Id.* ¶ 13.) The following tables quantify, in total and per year, the estimated magnitude of earnings loss for current permanent Custodian Engineers that will likely result from the award of retroactive seniority to the Custodian Engineer Offerees:

A. Total Earnings Loss (until retirement)

| Dollar Amount | Number of Custodian Engineers | Percentage |
|---|---|---|
| $0 | 255 | 68.9% |
| $1,000–$2,000 | 32 | 8.6% |
| $3,000–$5,000 | 75 | 20.3% |
| $5,000–$7,000 | 3 | 0.8% |
| $7,000–$10,000 | 5 | 1.4% |

B. Total Earnings Loss Per Year

| Dollar Amount | Number of Custodian Engineers | Percentage |
|---|---|---|
| $0 | 255 | 68.9% |
| $1–$100 | 32 | 8.6% |
| $101–$200 | 41 | 11.1% |
| $201–$450 | 42 | 11.4% |

(*Id.* Table 4.) According to these calculations, the average total loss per person equals $1,066, and the average loss per person per year equals $58. (*Id.*) However, 68.9 percent of current permanent Custodian Engineers will experience no relative loss of seniority and will therefore have no anticipated loss of earnings. (*Id.* ¶ 13.) For the remaining 31.1 percent of Custodian Engineers, the total amount of lost earnings will be relatively modest. Only approximately two percent of all current Custodian Engineers will experience a total loss of more than $5,000 from now until they retire, and those are the employees with the least seniority. (*Id.*) Thus, the economic effects of the Agreement on current Custodian Engineers, if any, will

---

**28.** This number corresponds to the service requirement to receive full pension benefits.

(Siskin Decl. ¶ 13.)

be limited. Moreover, under the terms of the Agreement, no incumbents will be discharged or displaced from their current school assignments.

None of the objectors has challenged the statistical analysis presented by Dr. Siskin. Moreover, as explained above, even Dr. Siskin's thorough statistical analysis has its limitations, as no one can predict which schools will become available when, or whether the Offerees will bid for the same schools as the objectors. Finally, even if the objectors' arguments were not wholly speculative, they would fail because "in a Title VII settlement of an employment discrimination claim, 'non minorities do not have a legally protected interest in the mere expectation of appointment[s] which could only be made pursuant to presumptively discriminatory employment practices.'" *Hispanic Soc'y of the New York City Police Dep't, Inc.,* 1986 WL 7014, at *4 (quoting *Kirkland,* 711 F.2d at 1126). *See also Franks,* 424 U.S. at 778–79, 96 S.Ct. 1251 (expectations that employees develop under a seniority system can be overridden by measures that advance important policy interests, such as providing relief for past unlawful discrimination); *Vanguards of Cleveland v. City of Cleveland,* 753 F.2d 479, 484–85 (6th Cir.1985) ("[s]ince non-minorities do not have a legally protected interest in promotions which could only be made pursuant to discriminatory employment practices, it follows that the legal rights of non-minorities will not be adversely affected by reasonable and lawful race-conscious hiring or promotional remedies"). As explained

above, plaintiff has clearly made a *prima facie* showing of adverse impact. Thus, to the extent any current employees may experience modest financial losses as a result of the grant of retroactive seniority to the Offerees, those individuals will simply return to the relative position they would have been in but for the alleged discriminatory practices. *See Franks v. Bowman Transp. Co.,* 424 U.S. 747, 768, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976).

In addition to complaining of the potential effect on their seniority rights, some of the objectors, including the proposed intervenors, also make arguments that are, in essence, simply objections to the use of race-conscious remedies. For example, the proposed intervenors claim that "[t]he proposed retroactive grant of seniority in the Settlement Agreement, to the extent it is based solely on an individual's race or ethnicity, constitutes illegal race discrimination" and that "Defendants have no compelling governmental interest to justify the use of race." (Compl. in Intervention ¶¶ 15, 16.) Numerous others testified at the fairness hearing that they viewed the Agreement's remedies as "reverse discrimination" against white males.[29]

As explained above, however, the law clearly provides for race-conscious remedies when necessary to eliminate the discriminatory effects of a challenged employment practice. *Albemarle,* 422 U.S. at 418, 95 S.Ct. 2362. Of course, the court must take into account the impact of such remedies on third parties. *Teamsters,* 431 U.S. at 375, 97 S.Ct. 1843. However, the

---

**29.** Although most of these objections were by white males, a few minority employees also objected on this ground. For example, Alvin Alvarez, a Hispanic male and a Custodian Engineer, complains that he passed the civil service examination with "no problem" thirty-five years ago, and that "[n]othing has changed since that time that would prevent other minorities from accomplishing the same...." (Letter to the court from Alvin Alvarez, dated April 14, 1999.) Mr. Alvarez believes that "New York State Civil Service laws have adequately protected minorities in this position" and that the Agreement "will

set an undesirable precedent." (*Id.*) In addition, Marilyn Brunkhors, a female Offeree who is now a permanent Custodian, testified at the hearing that she objected to the Agreement as unfair because it sought to appoint people to positions "not on the basis of qualifications or merit but merely their skin color or sex." (Transcript of May 27, 1999 Hearing ("Tr.") at 83.) She stated: "They want to give me four years' seniority above and beyond the seniority that I have earned as a permanent custodian. And I don't think that's fair. I didn't earn that seniority." (Tr. at 84.)

court is prohibited from denying make-whole seniority relief to the Offerees "on the sole ground that such relief diminishes the expectations of other ... employees." *Franks*, 424 U.S. at 774, 96 S.Ct. 1251. *See also City of Bridgeport*, 647 F.2d 256, 281 (2d Cir.1981) ("the mere possibility that a race-conscious remedy may have an adverse impact on nonminority individuals does not render that remedy impermissible"). As the Supreme Court has observed:

> These conflicting interests of other employees will, of course, always be present in instances where some scarce employment benefit is distributed among employees on the basis of their status in the seniority hierarchy.... "If relief under Title VII can be denied merely because the majority group of employees, who have not suffered discrimination, will be unhappy about it, there will be little hope of correcting the wrongs to which the Act is directed."

*Franks*, 424 U.S. at 774–775, 96 S.Ct. 1251 (quoting *United States v. Bethlehem Steel Corp.*, 446 F.2d 652, 663 (2d Cir.1971)).

In this case, the maximum number of people who will receive retroactive seniority under the Agreement is approximately fifty-four (54).[30] It is unfortunate that the solution contained in the Agreement "cannot fully succeed without affecting and, to some degree, frustrating the expectations of people who have no personal responsibility for the wrongs sought to be corrected." *Vulcan Soc'y*, 96 F.R.D. at 631. Nevertheless, as explained, the impact of this relief on the incumbent Custodians and Custodian Engineers will be minimal and dispersed, and the remedy is unquestionably legal and reasonable. These objections are therefore denied.

**2. *Objections based on the New York Civil Service Law***

Approximately 83 objectors challenge the Agreement on the ground that granting the Offerees permanent civil service status without requiring them to pass the civil service examination will violate New York State law. Similarly, the form objection letter submitted by approximately 160 objectors notes that under state law, applicants for the positions of Custodian and Custodian Engineer must take a competitive, written examination and must be appointed from a certified eligibility list in order to obtain civil service status.

■■■ New York Civil Service Law § 61(1) sets out the requirements for appointments or promotions from "eligible lists." N.Y. Civil Serv. Law § 61(1) (McKinney 1999). However, as plaintiff correctly points out, even if Congress has not expressly pre-empted state law in a given area, a state statute is invalid under the Supremacy Clause of the United States Constitution if it conflicts with federal law or "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Lawrence County v. Lead–Deadwood School Dist. No. 40–1*, 469 U.S. 256, 260, 105 S.Ct. 695, 83 L.Ed.2d 635 (1985) (citing *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 248, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984); *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). *See also Michigan Canners and Freezers Ass'n Inc. v. Agricultural Mkt'g and Bargaining Bd.*, 467 U.S. 461, 469–70, 104 S.Ct. 2518, 81 L.Ed.2d 399 (1984); *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 698, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984).

■■■ Thus, to the extent that a civil service rule conflicts with the operation of a settlement in a Title VII lawsuit, it is

---

**30.** 43 of the Offerees are Custodians and 16 are Custodian Engineers. As the parties explain in their submissions, this number will likely change slightly. One Offeree has resigned from employment, and another was recently terminated. In addition, a small number of objectors claim that they have been excluded from relief incorrectly because of the misidentification of their race or national origin, or due to other mistakes. As those claims are addressed, the total number of Offerees may be modified.

pre-empted by federal law. *See, e.g., Kirkland,* 711 F.2d at 1132 n. 18 ("Because state law must yield to federal law in Title VII cases, ... we need not consider whether the settlement agreement violates state law"); *Guardians Ass'n,* 630 F.2d at 104–05 ("Title VII explicitly relieves employers from any duty to observe a state hiring provision 'which purports to require or permit' any discriminatory employment practice") (citing 42 U.S.C. § 2000e–7 (1976)). Accordingly, these objections are denied.

### 3. *Objections by Individuals on the Eligibility Lists for Examinations 1074 and 7004.*

■ Approximately 53 of the objectors are individuals who took Custodian Examination 1074, given in 1993, or Custodian Engineer Examination 7004, given in 1997. The objectors who took Custodian Examination 1074 are now on the eligibility list and are concerned that fewer appointments will be available to them due to the appointments of the Offerees. However, as noted above, it is well-settled in this circuit that employees "do not have a legally protected interest in the mere expectation of appointments which could only be made pursuant to presumptively discriminatory practices." *Kirkland,* 711 F.2d at 1126. Moreover, a person on an eligibility list "does not possess 'any mandated right to appointment or any other legally protectable interest.'" *Id.* at 1134 (quoting *Cassidy v. Municipal Civil Serv. Comm'n,* 37 N.Y.2d 526, 529, 375 N.Y.S.2d 300, 337 N.E.2d 752 (1975)). Accordingly, these objections must be denied.

In addition, some of the 7004 Custodian Engineer Exam test-takers express concern with the establishment of the 7004 eligibility list and complain that the appointments of the Offerees will affect appointments from the 7004 eligibility list once it is established. As explained above, paragraph 26 of the Agreement states that defendants cannot create an eligibility list for the 7004 Exam until they have consult-

ed with plaintiff's expert on ways to reduce any adverse impact that Exam may have. That consultation is now in progress.

In addition to being speculative, these objections fail for lack of a recognized interest. Indeed, if individuals on an eligibility list do not possess a legally protectable interest (*id.*), then it follows that individuals who have merely taken an examination and have not been placed on an eligibility list do not have one. *See City of Bridgeport,* 647 F.2d at 284 ("the mere fact of application to take the exam could not have given rise to any very credible expectation of actual employment....."). Although the court must be sensitive to the interests of all affected third parties before approving a Title VII settlement (*United Steelworkers of Am. v. Weber,* 443 U.S. at 208, 99 S.Ct. 2721), it is not required to consider the interests of those who lack a legal basis for their claims. Accordingly, these objections are denied.

### 4. *Objections Arguing that the Agreement's Remedies are not Sufficiently Broad*

Several objectors contend that the remedies contained in the Agreement are unduly narrow. These include: (1) an objection complaining that practice exams and booklets for the challenged examinations were not useful; (2) four objections arguing that back pay should be awarded to the Offerees; (3) two objections demanding that punitive damages be assessed against defendants as an alternative to granting retroactive seniority to the Offerees; (4) an objection arguing that the Agreement should include specific relief for individuals who took the 7004 Examination; and (5) two objections demanding that the Board of Education make a concrete commitment to provide additional training for employees.

The instant settlement represents a compromise entered into after careful consideration and negotiation. Although it is possible that plaintiff might have obtained more relief had this case proceeded to

trial,[31] there was also a risk that no one would have received relief. However, the full range of possible remedies is not presently before the court. *See EEOC v. The New York Times Co.*, 1995 WL 135577, at *4 (S.D.N.Y.1995) (" '[t]he Court [should not] make the proponents of the agreement justify each term of the settlement against a hypothetical or speculative measure of what concessions might have been gained' ") (quoting *Milstein v. Werner*, 57 F.R.D. 515, 524–25 (S.D.N.Y.1972)). To uphold the Agreement, the court need only decide, as it has, that the proposed remedies are "substantially related" to eliminating the alleged discrimination without "unnecessarily trammel[ing] the interests of affected third parties." *Kirkland*, 711 F.2d at 1132. The fact that some individuals feel that the proposed relief is insufficient does not change the fact that the proposed remedies are "substantially related" to eliminating the disparate impact of the challenged hiring practices.[32]

5. *Objections Arguing for Expansion of the Remedies to Include Additional Individuals*

Several objectors complain about their exclusion from the list of proposed Offerees. These include (1) several provisional employees claiming to be members of one of the racial or national origin groups on whose behalf this case was brought, (2) provisional employees claiming some other type of minority or protected status, (3) objectors seeking to be included as Offerees because their spouses and children are members of minority groups, (4) minorities and women who have never served provisionally in the position of Custodian or Custodian Engineer, and (5) objectors urging the court to expand relief to all minorities and women who took the challenged examinations, or to all provisional Custodians and Custodian Engineers regardless of minority status.

With regard to the first group, the parties originally composed the list of potential Offerees based on how applicants identified their own race or national origin when they applied to the New York City Department of Citywide Administrative Services or its predecessor agency, the Department of Personnel, to take the civil service examination for Custodian or Custodian Engineer. In some circumstances, defendants have re-examined the available information and extended Offeree status to individuals who were not included on the original list. The remaining objectors asserting protected minority status, whose claims defendants have rejected, all identified themselves as white. Given these circumstances, it is unnecessary, and would be extremely unwise, for this court to second-guess defendants' determinations or attempt to engage in the dubious task of defining or categorizing any person's race or national origin. These objectors' own self-identifications as white are sufficient to exclude them from the benefits of the settlement.

The second group seeks to extend the scope of relief to include other minorities, such as Native Americans, or people with disabilities. While Title VII certainly protects Native Americans and other minority groups not included as Offerees, there has been no allegation or showing of disparate impact against them as a result of the

---

**31.** This does not, of course, apply to the objections seeking punitive damages. Even if plaintiff had prevailed on all claims at trial, punitive damages could not have been assessed against defendants, as compensatory and punitive damages are available remedies only in cases alleging intentional discrimination, as opposed to adverse impact. *See* 42 U.S.C. § 1981a(a)(1). Plaintiff has asserted no such allegations in this case.

**32.** In addition, the objection regarding the usefulness of the civil service test tutorial booklets must be denied. Those booklets are sold in bookstores and were not prepared, endorsed, or sold by defendants. Thus, defendants cannot be held responsible for the content of those materials or the test scores of individuals relying on them. Regardless, because defendants have agreed not to administer the challenged examinations again, the objection is moot.

challenged examinations. Accordingly, there is no appropriate basis to include them in the Agreement's remedial provisions. As for people with disabilities, Title VII does not apply to such claims.[33] Since this suit was brought only under Title VII, claims on behalf of the disabled clearly fall outside its reach.

Several objectors seek to be included in the relief because their spouses and children are members of minority groups, although the objectors themselves are not. However, this case was brought to address the disparate impact of certain hiring practices on minority job seekers, not on minority families of white job-seekers. The fact that the settlement may have incidental effects on family members of job seekers does not warrant extending the remedial provisions of the Agreement to these objectors.

Finally, a number of objectors argue for the expansion of relief to all minorities and women who took the challenged examinations, or to all provisional Custodians and Custodian Engineers regardless of minority status. In essence, these objectors complain that the agreement to extend Offeree status only to past and present minority and provisional Custodians and Custodian Engineers is unfair. These objections fail for a few reasons. First, it would be irrational to grant Offeree status to all provisionals since the United States brought this lawsuit on behalf of blacks, Hispanics, Asians, and women—not on behalf of all employees—and has not challenged the provisional hiring process in any way. Second, the group of individuals who are eligible for conversion to permanent status with retroactive seniority was the subject of extensive, arms-length negotiation and compromise, which resulted in an Agreement that was crafted carefully to account for the effect it would have on Offerees, incumbents, and third parties. Finally, this result is reasonable since it provides relief to people who have already served as Custodians and Custodian Engi-

neers and have thus demonstrated their ability to perform those jobs well. For all of these reasons, the objections are denied.

### 6. *Miscellaneous Objections*

The court has reviewed all of the remaining objections, as well as all applicable terms of the Agreement, and finds these objections meritless, irrelevant, or beyond the scope of this lawsuit.

### D. *The Motion to Intervene*

As stated above, three current employees—James Ahearn, John Brennan, and Kurt Brunkhorst—move to intervene in this case. Each of the proposed intervenors took and passed the 1993 Custodian Examination No. 1074, which is one of the examinations plaintiff challenges in the complaint. (Decl. of Norma A. Cote, dated June 8, 1999 ("Cote Decl."), ¶ 14.) The proposed intervenors ranked numbers 92 (Ahearn), 26 (Brennan), and 194 (Brunkhorst) of those who passed the test and were included on the eligibility list. (*Id.*) Ahearn and Brennan were appointed as permanent Custodians from that list on or about March 24, 1997, with a start date of April 4, 1997. (*Id.*) Brunkhorst was appointed as a permanent Custodian on or about August 18, 1997. (*Id.*) All three proposed intervenors are now working as provisional Custodian Engineers. (Transcript of May 27, 1999 Fairness Hearing ("Tr."), at 17.) Ahearn and Brennan also took Custodian Engineer Exam 7004 in 1997. (Cote Decl. ¶ 15). Should the three proposed intervenors achieve permanent status as Custodian Engineers, they will start to accrue seniority *de novo* and their previous seniority as Custodians will not carry over. (*Id.* ¶ 17.)

The proposed intervenors seek an order granting them intervention as of right under Rule 24(a)(2) of the Federal Rules of Civil Procedure, which provides, in pertinent part:

---

**33.** Such claims fall under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.*

Upon timely application anyone shall be permitted to intervene in an action ... when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by the existing parties.

F.R. Civ. P. 24(a)(2). Thus, in order to intervene as of right under Rule 24(a)(2) an applicant must (1) file timely, (2) demonstrate an interest in the action, (3) show an impairment of that interest arising from an unfavorable disposition, and (4) have an interest not adequately represented. *See Restor–A–Dent Dental Labs., Inc. v. Certified Alloy Prods., Inc.,* 725 F.2d 871, 874 (2d Cir.1984). Failure to satisfy any one of these requirements is sufficient grounds to deny the application. *Washington Elec. Coop., Inc. v. Massachusetts Mun. Wholesale Elec. Co.,* 922 F.2d 92, 96 (2d Cir. 1990); *United States v. State of New York,* 820 F.2d 554, 556 (2d Cir.1987).

■ Although "there is no clear consensus as to what constitutes an 'interest' under Rule 24(a)(2), ... the plain language of the rule indicates that the 'interest' must pertain to 'the property or transaction' that comprises 'the subject of the action.'" *Liz Claiborne, Inc. v. Mademoiselle Knitwear, Inc.,* No. 96 CIV. 2064, 1996 WL 346352, at *3 (S.D.N.Y. June 25, 1996). Moreover, the interest must be "significantly protectable and direct as opposed to remote and contingent." *United States v. State of New York,* 820 F.2d at 558. *See also New York News, Inc. v. Kheel,* 972 F.2d 482, 486 (2d Cir.1992) (an intervenor's interest must be "direct, substantial, and legally protectable"); *Commack Self–Service Kosher Meats, Inc. v.*

*Rubin,* 170 F.R.D. 93, 100 (E.D.N.Y.1996) (the term "interest" defies a simple definition but contemplates that "'an absentee would be substantially affected in a practical sense by the determination made in an action. ...'") (quoting Advisory Committee Notes, 1966 Amendment, Federal Civil Judicial Procedure and Rules, at 104 (West Publishing, 1966 ed.)).

■ In this case, the proposed intervenors cannot claim interests in their seniority rankings. As explained above, a civil servant has no vested property right in a particular position or appointment, and "a person on an eligibility list does not possess 'any mandated right to appointment or any other legally protectible interest.'" *Kirkland,* 711 F.2d at 1134 (quoting *Cassidy v. Municipal Civil Serv. Com'n,* 37 N.Y.2d 526, 375 N.Y.S.2d 300, 337 N.E.2d 752 (1975)).

Although the proposed intervenors assert an interest in "equal treatment and nondiscrimination" (Reply Br. in Support of Mot. to Intervene at 2), that interest is not implicated here. Because race-conscious remedies are designed only to return employees to the positions they would have been in but for the alleged discrimination, the legal rights of non-minorities "generally are not adversely affected by reasonable and lawful race-conscious hiring or promotional remedies, whether such remedies are imposed by court order following litigation on the merits or are created by voluntary agreement between the parties." *Kirkland,* 711 F.2d at 1126. *See also Youngblood v. Dalzell,* 123 F.R.D. 564, 566–67 (S.D.Oh.1989) (denying intervention for non-minority applicants, who would have been members of fire department recruit class if class had been chosen solely on basis of scores received in civil service exam, as lacking a significant protectable interest).[34]

---

**34.** The Second Circuit's holding in *Kirkland* supports this conclusion. In *Kirkland,* the court held that although non-minority third parties *do* have an interest that entitles them to object to a settlement agreement implementing race-conscious remedies and to argue that such remedies are unreasonable or unlawful, that interest is "not so strong as to require their consent to the agreement." *Kirkland,* 711 F.2d at 1128. It therefore up-

Even if the proposed intervenors could assert some cognizable interest in their seniority rights, that interest would be remote and speculative. As explained above, the Agreement incorporates 43 Custodians and 16 Custodian Engineers into an existing seniority system that currently contains over 400 permanent Custodians and nearly as many Custodian Engineers. As defendants point out, it would require a confluence of multiple, independent contingencies for any of the proposed intervenors to be denied a transfer due to the grant of retroactive seniority to the Offerees. As an initial matter, out of the hundreds of other Custodians, including the hundreds who already have higher seniority than the proposed intervenors, at least one of the Offerees would have to request a transfer to the same school as the proposed intervenor. As a prerequisite, however, an Offeree must have the same job title as the proposed intervenor (*i.e.*, a Custodian Engineer cannot bid on a school slated for a Custodian, or vice versa). Thus, the number of potential competitors will shrink even more if the proposed intervenors ever become permanent Custodian Engineers, since there are fewer Offerees in that job title.

Next, the performance ratings of the Offeree and the proposed intervenor would have to be within .25 points of each other. If the proposed intervenor has a higher ranking, then he will outrank the Offeree, regardless of seniority. Correspondingly, if the Offeree has a higher rating, then it will be that rating, and not his or her relative seniority, that will place the Offeree ahead of the proposed intervenor in the competition for that school. (*See* Siskin Decl. ¶ 5.)

Finally, the Offeree and the proposed intervenor would have to occupy positions 1 and 2 on the transfer list for that school. If they are, for example, numbers 2 and 3 and someone else is number 1 and receives the transfer, then it will be that person and not the Offeree who prevented the proposed intervenor from getting the assignment. Or, if they are numbers 1 and 3 and the Offeree gets the transfer, then the Offeree has not necessarily deprived the proposed intervenor of that assignment, since the number 2 bidder would most likely have received the assignment otherwise. (*See* Lonergan 5/20/99 Decl. ¶ 21.)

When one considers all of the variables that would have to fall into place in order for one of the proposed intervenors to be adversely affected by the grant of retroactive seniority to the Offerees, it becomes clear that the interest claimed by the proposed intervenors is not the type of "direct, substantial, and legally protectable interest" contemplated by Rule 26(a)(2). *See Stewart v. Rubin*, 948 F.Supp. 1077, 1105–06 (D.D.C.1996) (speculation about possible future injury from settlement implementing race-conscious remedies held insufficient to give putative intervenors standing to intervene), *aff'd*, 124 F.3d 1309, 1997 WL 369455 (D.C.Cir.1997).[35] Accordingly, the motion to intervene is denied.

held the lower court's grant of conditional intervention, which allowed non-minorities to intervene "solely to object to the settlement." *Id.* In the instant case, the putative intervenors do not seek any form of conditional intervention, but rather seek full party status, discovery, and a judgment declaring the Agreement "illegal, null, and void." Moreover, the proposed intervenors have already been afforded a full and fair opportunity to be heard on their objections to the Agreement, and counsel was permitted to appear and argue on their behalf at the fairness hearing. Although the United States does not object to granting the proposed intervenors limited intervention for the purpose of appealing the

Agreement's provisions concerning retroactive seniority, the proposed intervenors reject that proposal. (*See* Reply Br. in Support of Mot. to Intervene, at 14–15.) This court sees no reason to reach out to order a compromise solution that the proposed intervenors themselves do not want.

35. The school transfers at issue here are wholly distinguishable from the promotion routes to higher titles that were at issue in *Howard v. McLucas*, 782 F.2d 956 (11th Cir. 1986) (allowing intervention where proposed consent order would promote 240 class members to "target" positions and make white employees ineligible for those promotions),

### Conclusion

The essence of a settlement is compromise. Each side gains the benefit of immediate resolution of the litigation and some measure of vindication for its position while foregoing the opportunity to achieve an unmitigated victory. *Hiram Walker & Sons,* 768 F.2d at 889 (citing *United States v. Armour & Co.,* 402 U.S. 673, 681, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971); *McDonald v. Chicago Milwaukee Corp.,* 565 F.2d 416, 429 (7th Cir.1977); *United States v. City of Jackson, Mississippi,* 519 F.2d 1147, 1152 (5th Cir.1975)). *See also Milstein v. Werner,* 57 F.R.D. 515, 524–25 (S.D.N.Y.1972) ("inherent in compromise is a yielding of absolutes and an abandoning of highest hopes"). In this case, while the number of objectors is of some concern, on balance the substantial risks of litigation and the time and expense that continued discovery and a long trial would require justify the settlement. Although the Agreement may not provide complete satisfaction to all those it affects, this by itself is not enough to render the Agreement "unreasonable." *New York Times Co.,* 1995 WL 135577, at*4. Indeed, if that were the standard, then Congress's expressed preference for achieving Title VII compliance by voluntary means would be frustrated in all but the most rare instances. *Id.*

Under *Kirkland,* this court need only decide whether the Agreement is "substantially related to the objective of eliminating the alleged instance[s] of discrimination" and does "not unnecessarily trammel the interests of affected third parties." *Kirkland,* 711 F.2d at 1132 (citations omitted). Having reviewed the terms of the Agreement and carefully considered all of the objections, I find that the Agreement satisfies this objective and that none of the objections overcome the presumption of validity this court must accord to the Agreement. My review of the Agreement reveals no provision that could be called unreasonable, illegal, unconstitutional or against public policy. To the contrary, the goals established by the Agreement coincide exactly with those of Title VII to ensure equality of employment opportunities for groups that have been excluded from full participation in the labor market. Accordingly, the Agreement is hereby approved. Moreover, for the reasons stated above, the proposed intervenors' application for intervention as of right is denied. The Clerk of the Court is directed to enter the Agreement as a final resolution of the claims asserted by the United States.

SO ORDERED.

---

and *United States v. City of Chicago,* 870 F.2d 1256 (7th Cir.1989) (allowing intervention by white female sergeants who were denied otherwise certain promotion to lieutenant due to promotions of blacks and Hispanics based on race-conscious adjustments of test scores), or the wholesale substitution of a new seniority system, as in *Stallworth v. Monsanto Co.,* 558 F.2d 257 (5th Cir.1977) (remanding for factual hearing as to whether remedial provisions of consent decree would interfere with proposed intervenors' contractual rights). Nor will the proposed intervenors be "foreclosed from employment" on account of race, as in *United States v. State of New York,* 820 F.2d at 558 (denying motion for intervention but noting in dicta that proposed intervenor's interest would have been "direct and protectable" if applicant were not otherwise ineligible for employment).